IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CT-03315-M-RJ

| | | |
|---|---|---|
| KADEEM KIRK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| PRISON STAFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' amended motion for summary judgment, Mot. [D.E. 95]. As discussed below, the court grants in part and denies in part this motion.

Relevant Procedural History:

On August 17, 2022, Kadeem Kirk ("plaintiff"), a state inmate proceeding without prepayment of fees, filed *pro se* a complaint under 42 U.S.C. § 1983. See [D.E. 1, 6, 10]. In response to a court order, Order [D.E. 3], plaintiff filed the operative complaint, Compl. [D.E. 5].

On February 13, 2023, the court, *inter alia*, conducted its initial review and allowed Eighth Amendment failure-to-protect claims pursuant to events surrounding a May 14, 2020, stabbing incident at Bertie C.I. to proceed against Victor Locklear, John M. Sapper, and Patricia White (collectively, "defendants"), but dismissed other claims and defendants. See Order [D.E. 14].

On June 12, 2023, defendants answered the operative complaint. Answer [D.E. 25].

On December 7, 2023, plaintiff moved through counsel to compel discovery, see Mot. [D.E. 40], and the court granted the motion on December 28, 2023, see Order [D.E. 46].

On April 22, 2024, the court awarded plaintiff attorney's fees. Order [D.E. 57].

On July 22, 2024, plaintiff filed a motion to stay. Mot. [D.E. 66].

On August 16, 2024, the court denied the motion to stay. Order [D.E. 70].

On September 26, 2024, defendants filed a motion for summary judgment, Mot. [D.E. 72], a statement of facts [D.E. 73], an appendix [D.E. 74], and a memorandum [D.E. 75], and, pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the motion, the consequences of failing to respond, and the response deadline, [D.E. 76].

On September 27, 2024, defendants moved for a protective order, Mot. [D.E. 77], which the court granted on October 24, 2024, see Order [D.E. 80].

On November 7, 2024, as their Exhibit 6, defendants filed under seal a redacted version of Bertie C.I. Standard Operating Procedures as to offender restrictive housing. See [D.E. 81].

On January 27, 2025, plaintiff filed a response in opposition. Pl.'s Resp. [D.E. 84].

On April 2, 2025, plaintiff filed motions seeking a stay and an order, see Mot. [D.E. 85]; Mot. [D.E. 86], which defendants opposed, see [D.E.87, 88].

On April 28, 2025, plaintiff moved for a protective order. Mot. [D.E. 89].

On May 1, 2025, plaintiff moved for a hearing. Mot. [D.E. 90].

On July 7, 2025, the court denied without prejudice defendants' motion for summary judgment and denied plaintiff's motions for a stay, an order, a protective order, and a hearing. See Order [D.E. 94].

On August 1, 2025, defendants filed an amended motion for summary judgment, Mot. [D.E. 95], a statement of facts [D.E. 96], an appendix [D.E. 97], and a memorandum [D.E. 98], and, pursuant to Roseboro, 528 F.2d at 310, the court notified plaintiff about this motion [D.E. 99].

On August 29, 2025, plaintiff filed a response in opposition. Pl.'s Resp. [D.E. 100].

2

Statement of Facts:

As discussed below, the facts are disputed. The parties agree that, at the relevant time during plaintiff's confinement, Bertie C.I. had policies and procedures regarding inmate grievances and protective custody, but disagree whether these policies were followed. Compare Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶1, with Defs.' Stmt. Mat. Facts [D.E. 96] at ¶1.

Defendants state: when an offender requests protective custody ("PC"), the offender is placed in Restrictive Housing for Administrative Purposes ("RHAP") for a "Control Investigation" of the offender's claims that typically is carried out by officers in the offender's housing unit; "To request a Control Investigation and PC, an offender must make the request in writing using a protective housing request form, which requires the requesting offender to explain why he needs protective housing"; and "After the control investigation is completed, the requesting offender meets with the Facility Classification Committee ('FCC') to determine if the requesting offender's allegations are valid and if PC is necessary." Defs.' Stmt. Mat. Facts [D.E. 96] at ¶¶2–4. Plaintiff, by contrast, states that, although he submitted a PC request and a form "DC-138B statement," no Control Investigation occurred and that, had a Control Investigation been done, "it would look like" a standard Control Investigation form. Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶2–3 (citing Pl.'s Ex. 2, [D.E. 100-5] at 2-8 (plaintiff's Aug. 4, 2021, Control Investigation incident report arising from his July 26, 2021, request for protective custody at Eastern C.I.)).

Defendants state: "After Plaintiff submitted a request for PC[,] also referred to as PCON, on May 1, 2020, Plaintiff was placed in RHAP while a Control Investigation was conducted," but his "request for PC did not specify the names of those who were allegedly threatening him or any substantive evidence of the allegations." Defs.' Stmt. Mat. Facts [D.E. 96] at ¶5. Plaintiff, by

3

contrast, states he "did submit a request for PC on the offender request form and in writing on a DC-138B witness statement form specify the names of those (SRG) Security Risk Group offenders that [were] threatening him as he did after he was assault[ed] provide the names of those offenders that was threatening to hurt him [sic]." Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶4 (citing Pl.'s Ex. 4, [D.E. 100-5] at 12–13 (plaintiff's May 19, 2020, post-assault DC-138B witness statement)).

On May 3, 2020, plaintiff wrote a letter to Warden Sapper asking to speak with Sapper about threats from other offenders. Compare Defs.' Stmt. Mat. Facts [D.E. 96] at ¶6 (stating this "letter did not specify who has threatened him and his letter contained only general statements that Plaintiff was being threatened"), with Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶5 (stating his letter "did specify that he was being threatened by level three (SRG) Security Risk Group offenders").

Sapper's response letter stated that the matter was forwarded to Associate Warden Locklear for review. Defs.' Stmt. Mat. Facts [D.E. 96] at ¶7; Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶6.

On May 6, 2020, Locklear sent a memo to plaintiff stating: Locklear reviewed his request form addressed to Sapper and spoke to SRG staff "who indicated that none of Plaintiff's allegations were found to be credible"; plaintiff should meet with the committee to discuss his PC request; and that Locklear advised him "to provide detailed information on the names of those threatening Plaintiff so that an appropriate investigation of the threats could be conducted." Defs.' Stmt. Mat. Facts [D.E. 96] at ¶8; but see Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶7 (stating there was no "appropriate investigation" done because plaintiff never spoke to, or met with, SRG staff).

On May 12, 2020, plaintiff met with the FCC, including defendant White, to discuss his PC request, but the parties disagree as to the particulars. Defendants state that, at the time, the FCC "had not received any information or evidence substantiating Plaintiff's claims of threatened

4

assault," Defs.' Stmt. Mat. Facts [D.E. 96] at ¶9, but plaintiff again states that defendants did not follow policy regarding the Control Investigation, see Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶8.

The parties wholly disagree whether plaintiff identified the offenders who were threatening him in this FCC meeting. Compare Defs.' Stmt. Mat. Facts [D.E. 96] at ¶9 ("Plaintiff refused to provide the names of offenders who had allegedly threatened to harm him"), with Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶9 (stating that he "informed the defendant . . . that he was being threatened by SRG level three Gang members and provided the committee with the names of the Gang members that [were] threatening him as he did on his DC-138B statement form along with the PC request form May 1, 2020[,] as he did May 14, 2020 after being assaulted . . .").

The parties strongly dispute what custody options were presented to plaintiff at the FCC meeting and how plaintiff responded. Compare Defs.' Stmt. Mat. Facts [D.E. 96] at ¶¶9–11 (stating: "Plaintiff was informed that he could stay in PC control housing until there was space available in a different correctional institution for him to move or he could return to the general population"; "During this time, the COVID-19 pandemic caused additional restrictions and requirements," which meant plaintiff "could not be immediately transferred to a different correctional facility"; "Plaintiff became irate with the FCC and stated that he would not stay in PC control housing"; "Without the names of the offenders who allegedly threatened Plaintiff, the FCC could not separate or take any measure to protect Plaintiff in general population housing"; "The FCC further explained to Plaintiff that they could only ensure his safety by keeping Plaintiff in PC control housing"; "However, Plaintiff had complete discretion and control to decide to return the general population housing"; "Plaintiff was adamant about returning to the general population and stated that he was 'going back to the yard'"; "Plaintiff chose to return to the general population

5

housing even though he was informed by the FCC that they could not ensure his safety"), with Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶8–10 (stating, *inter alia*, that: Eastern C.I. "P-Con was a close custody institution"; "plaintiff was forced back into danger by the defendants"; "the defendants threatened plaintiff with I-CON which is more of a punishment"; he "never became irate with the FCC"; he provided the committee with the names of the Gang members that were threatening him; he "could not have been adamant about going back to general population because plaintiff was given the directive to return to Tan Unit where he was housed before he requested protective custody or refuse and be placed on Restrictive Housing"; if he "would have disobeyed the directive given[,] he would have been subject to a B-25 disciplinary action infraction which he would have been punished"; and defendants "don't make it clear that plaintiff would have received a disciplinary infraction, lost ten dollars and privileges like canteen, visitation and other things").

Also on May 12, 2020, plaintiff signed two statements on a Bertie C.I. form that 1) requested his removal from protective housing and placement back in the general population, and 2) stated he did not need protective custody, see Defs.' Stmt. Mat. Facts [D.E. 96] at ¶¶12–14, but plaintiff contests the voluntariness and significance of these signatures, see Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶11–16 (stating, *inter alia*, that: he "was under direct duress coercion or threat"; if he refused to sign, he "would have been disobeying a direct order and would have been placed in Solitary Confinement[,] depriving him of $10.00 administrative fees, visitation with his family, commissary[,] and phone and T.V. Privileges"; he "did not fully understand the collateral consequences of signing any alleged waiver of rights"; he "made it clear to defendants at the hearing that he still feared for his life in the general population"; "Regardless of any waiver that he may have signed, prison officials have a duty to protect inmates from known imminent danger"

6

under Farmer v. Brennan, 511 U.S. 825 (1994) ("Farmer"); and this waiver was not signed under penalty of perjury and "was in essence an unconstitutional form of contract negated by" Farmer).

After plaintiff returned to the general population on May 14, 2020, he was stabbed by fellow offenders. See Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶13, 17 (stating: "plaintiff made clear . . . to staff May 14, 2020 once release[d] back into general population that he feared for his life and still needed protective custody"; and "After plaintiff was forced to sign off requesting [PC] he was then placed back into the general population on May 14, 2020[,] where he was stabbed over 20 times which plaintiff did notify defendants and staff that he still feared for his life [sic].").

The parties again disagree whether defendants were aware of who was threatening plaintiff. Compare Defs.' Stmt. Mat. Facts [D.E. 96] at ¶¶16–17 (stating: "Plaintiff did not follow the advice given from Warden Locklear and did not report the names of those offenders allegedly threatening him"; "The Defendants were unaware of the individuals Plaintiff felt threatened by and were unaware of an actual threat existed for Plaintiff's safety"; and "The Defendants understood plaintiff had signed a document stating that he wanted to return to the general population, and that Plaintiff had signed a document stating that he no longer had concerns for his safety"), with Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶18 (stating, inter alia, that: "plaintiff did follow the advice given by Warden Locklear"; "plaintiff not only provide[d] names May 1, 2020, of the SRG level three offenders on a DC-138B form with the requested form for protective custody but provided also the dirty officer name in the letter to Warden Sapper May 3, 2020"; on May 12, 2020, plaintiff "once again provided defendants with the names of the SRG Gang members that [were] threatening plaintiff['s] life"; he "put defendants on notice to a threat to his life," but defendants refused to provide him "with protective control housing before the assault"; and defendants were

7

aware of the individuals plaintiff felt threatened by, and also were aware an actual threat to plaintiff's safety existed, but they "refused plaintiff (P-Con) protective control").

<u>Legal Standard</u>:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, <u>Anderson</u>, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. <u>Anderson</u>, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).

<u>Discussion</u>:

1) <u>Injunctive Relief</u>:

Although plaintiff seeks vague injunctive relief, <u>see</u> [D.E. 5] at 8, his request presumptively was mooted by his intervening prison transfers, N.C. Dpt. Adult Correction, Offender Pub. Info., https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=1423517&searchOffenderId=1423517&searchDOBRange=0&listurl=pagelistoffendersearchresults&listpage=1

8

(search by inmate number) (visited Sept. 15, 2025) (reflecting plaintiff earlier was at Harnett C.I. and now is at Mountain View C.I.); see Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." (citation omitted)); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (finding injunctive relief mooted by transfer).

The court also does not discern that any exception to the mootness doctrine applies. Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Williams v. Ozmint, 716 F.3d 801, 809–10 (4th Cir. 2013).

   2) Official Capacity Claims:

Although plaintiff alleges official-capacity claims against defendants, Compl. [D.E. 5] at 3–4, these claims are barred by the Eleventh Amendment because North Carolina has not waived immunity, Answer [D.E. 25] at 4; see Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989), and the prospective relief exception under the doctrine of Ex parte Young, 209 U.S. 123 (1908), does not apply, cf. Doe v. Univ. of N. Carolina Sys., 133 F.4th 305, 318 (4th Cir. 2025).

   3) Individual Capacity Claims:

The court now turns to plaintiff's individual-capacity claims against defendants. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id.

9

(quotation and emphasis omitted); see Farmer, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

Prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," Farmer, 511 U.S. at 833 (citation and quotation marks omitted), but an official will not be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Thus, failure to alleviate a significant risk of harm an official "should have perceived but did not" is insufficient. Id. at 838. To succeed on a failure-to-protect claim, a plaintiff must show: 1) he was incarcerated under conditions posing a substantial risk of serious harm; 2) the official was deliberately indifferent to that substantial risk to his health and safety; and 3) the official's deliberate indifference caused the harm. Id. at 834; see Ford v. Hooks, 108 F.4th 224, 230 (4th Cir. 2024) (requiring an inmate to "show both (1) 'that the [prison] official in question subjectively recognized a substantial risk of harm' and (2) that the official also 'subjectively recognized' that any actions he took in response 'were inappropriate in light of that risk.'" (citation omitted)).

The doctrine of *respondeat superior* generally does not apply to a § 1983 action. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978). Rather, for a cognizable supervisory liability claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting

10

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); see King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023).

A. Plaintiff's Declarations:

Plaintiff declares, *inter alia*, that: he was sent to Bertie C.I. in January 2020; he was medium custody, housed in the Tan Unit; in April 2020, he "started being threatened by SRG gang members, which that same month the UBN Bloods sent offender William Cox to assault [him,] but it was unsaid why [sic]"; on May 1, 2020, he reported to the Tan Unit Sergeant requesting protective housing "due to [his] life being in danger by level 3 UBN gang members, which [he] wrote the names of the members threatening [him] [sic]"; he was given the Bertie C.I. PC request form and a DC-138B witness statement form "explaining why [he] feared for [his] life and the offenders who were threatening [his] life"; he was placed in "the hole," RHAP, pending a PC investigation; on May 3, 2020, because he had not spoken to anyone about his PC request, he sent Sapper a request form with a letter attached explaining concerns about his life being in danger; on May 5, 2020, he received a response from Sapper stating Sapper received the correspondence and would forward it to Locklear for review and appropriate action; on May 6, 2020, he received a memo from Locklear stating Locklear received plaintiff's letter to Sapper about gang members threats and "had spoken to SRG staff who indicated they had addressed [plaintiff's] concerns by meeting with [plaintiff], but none of [plaintiff's] allegations [were] credible; Locklear's memo also stated that Locklear "was advised that the altercation between [plaintiff] and Offender Cox was 'possibly' 'staged'" for both offenders to get moved out of their current pod assignment, "that [plaintiff] would be meeting with the [Protective Control Committee] PCC to discuss [his] request for protective housing[, and that plaintiff] should provide detailed information to include names of

11

SRG offenders that are threatening [him]"; he "never spoke with SRG staff concerning any threat on [his] life" until the May 12, 2020, FCC hearing with White, SRG Captain Deloatch, and SRG Sergeant Coley; he followed Locklear's advice at this hearing, explaining he was being threatened by "UBN SRG Gang members due to a letter [he] had suppose to [sic] had wrote to SRG about knowing where these offender kept there [sic] phones and drugs and the dirty officers they was bring it in to them [sic]"; he also explained that, "back in April 2020[,] Officer Mayo [sic] from Tan Unit came to the hole where [he] was [and] told the UBN SRG gang members that [offender] Cox and [plaintiff were] working with the SRG at the institution to take them down"; he also "provide[d] the dirty officer name who called the hit [sic]"; White told him that he would not be placed on PC which "forced" him to "return to Tan housing where [he] feared for [his] life"; White told him "that she did not give a fuck who [he] called to tell them her name was P. White [sic]"; White "stated go back to Tan housing where [he had] requested PC or she would put [him] on I-CON"; "I-CON is Intensive Control, which is a long term removal of close custody felon or minimum custody level I misdemeanant inmate from the general inmate population to confinement in a secure area [sic]"; "at no time did White tell [plaintiff] that [he] could be placed on RHAP to keep [him] safe into a room [sic]" at Eastern C.I. or any other institution; at the time, Eastern C.I. "was a close custody institution and as well as there [sic] P-CON unit, so once again [he] was medium custody not close custody"; he "was then given a directive order [sic] by [Sergeant] Coley"; "In no way did [he] want to go back into danger but [he] was given no choice" because, if he "did not sign off," he "would have been punished by refusing a directive order [sic] which is against there [sic] policy and placed on I-CON which [he] would have been sent to close custody from medium custody and lost all privileges associated with medium custody level"; thus, he

12

"would have been punished for feeling unsafe [sic]"; on May 14, 2020, he was told to return to Tan Unit; as he was being let out of "the hole," he "explained to staff after being released from RHAP that [he] feared for his life" in the general population, but "nothing was done" and "no one would listen"; he "was then placed back on Tan unit where [he] was being threatened which [sic] [he] was then stabbed over 20 times by the UBN SRG Gang members [he] named in [his] PCC hearing May 12, 2020"; he was taken to outside medical for injuries to his neck, head, back, arms, and legs; and no Control Investigation was done by Bertie C.I. staff either before or after this stabbing. See Pl.'s Aff. Stmt., [D.E. 100-3] at 1–3; Pl.'s Aff. Stmt., [D.E. 84-4] at 11–13.

    B. Defendant Sapper:

    Defendant Sapper declares, *inter alia*, that: Sapper then was Bertie C.I. Warden; Bertie C.I. had procedures for offenders requesting PC; offenders typically would need to request PC by completing a form where they would include an explanation of why PC was needed; after the form was completed, staff would investigate the request to determine if the offender's claims were valid and PC was necessary; the investigation would include gathering statements from the named participants; the PCC then would decide whether to grant the requesting offender PC; if a requesting offender informed staff he was receiving threats from other inmates, the same procedures would be followed and, depending on the situation, senior level staff would review footage and interview other offenders to determine if the allegations made by the requesting offender were true; to properly address a requesting offender's safety concern, the offender needed to provide 1) who had threatened the offender, 2) what the threat was, and 3) why the offender believed they had been threatened; lacking this information, Bertie C.I. staff could neither fully investigate the requesting offender's concern, nor separate the requesting offender from those

13

threatening them in general population housing; Sapper does not recall if he had any conversations with plaintiff; if plaintiff would have raised concerns to Sapper either verbally or through a written letter, Sapper would have directed plaintiff to complete the PC forms as required by Bertie C.I. procedures; if Sapper did have any information regarding plaintiff's safety or the safety of other inmates, Sapper "would have turned that information over to one of the Associate Wardens to determine if that information was valid"; if an offender is in PC, they may request to be removed from PC and returned to the general population by signing two statements – 1) that the offender himself is requesting removal from PC, and 2) that he no longer fears for his safety; plaintiff requested PC on May 1, 2020; on May 3, 2020, Sapper received a written request from plaintiff seeking to speak to Sapper about safety concerns, and Sapper promptly responded to plaintiff that Sapper was forwarding this information to Associate Warden Locklear because Sapper, as the Warden, was not in charge of determining the legitimacy of offender requests; after reviewing the incident report, Sapper was aware that, on May 12, 2020, plaintiff signed two statements – one which requested that he be removed from PC and one that he "no longer had protective needs"; plaintiff was returned to the general population on May 14, 2020; Sapper "had no knowledge or reason to doubt Plaintiff's signed statement that he no longer needed PC"; Sapper has "no other direct knowledge of the incident alleged in Plaintiff's complaint"; and "At no time was [Sapper] aware of who had allegedly threatened Plaintiff nor did Plaintiff inform [Sapper] of who had allegedly threatened him." See Defs.' App., Ex. 1, Sapper Decl. [D.E. 97-1].

The record reflects plaintiff's May 3, 2020, inmate request form asking to speak to Sapper about his "life being threatened by gang members and [illegible] nothing being done about it to make sure [he is] safe." Defs.' App., [D.E. 97-4] at 3. An attachment to this letter states:

14

Mr. Sapper[,] I am writing to you because for the past few weeks I have been writing the SRG Captain, Sgt., and SRG Officer about my life being threatened by gang members here at the prison due to a letter I wrote to officer Wilder SRG letting her know that I had facts about phones, drugs and dirty officers on Tan-1 and Tan-2, but the letter never made it to her. I gave the sealed letter to officer Hundly who was working Red Seg April 20, 2020. Officer Hundly stated to me that [Hundly] gave the sealed letter to Sgt. Rowland who was sick that day and went home. Around dinner time, Officer Mayao [sic] from Tan-1 came to Red Seg B-pod and went to the back to talk to [an] offender who was a gang member. After speaking to that offender[,] he stated I just got word that Kadeem Kirk and my opus # Red 2 red seg B-pod is a Rat and another boy name William Cox. Mr. Sapper[,] William Cox and I got into a fight April 17, 2020. To my understanding[,] he wrote SRG too and now his life is being threatened by the same gang members. Mr. Cox and I [were] both let out [of] the hole May 1 2020 and SRG had known that we [were] not safe. I went into B-pod Tan-1 but, the next day, I was told by bloods that I could not leave [sic] in that pod[,] so I talk to Sgt. Sweak[,] and he moved me to A-pod Bunk 7[,] but I never got to unpack. A blood came to me and told me that I could leave or get stabbed in the Dayroom in front of everybody. [An] offender walked me to the Sgt. officer and stated to the Sgt.[,] this is my friend, son[,] and I'm not got to let nobody do anything to him [sic] and that I could not come back to block because gang member wanted to kill me [sic]. Sgt. stated to me that it was in my best interest to sign [protective custody] papers and go to Red Seg. Every time Sgt. work them gang members do what they want [sic].

I do have facts about dirty officers who are gang members themselves and facts about where all phones are on Tan-1 and Tan-2. These officers who are dirty along with the offenders who are gang members with these phones threaten the security of the prison and staff safety!!!

Please[,] I would like to speak to you in person.

P.s. my mother work in Raleigh as I'A'S !! [sic].

Id. at 4–5.

Sapper's May 5, 2020, memorandum in response to plaintiff states: "Please be advised my office is in receipt of your correspondence. After reviewing your correspondence, it has been forwarded to Mr. V. Locklear, Associate Warden III for review and appropriate action. If you have further concerns while housed at Bertie [C.I.], please feel free to contact me." Id. at 2.

15

Locklear's May 6, 2025, memorandum to plaintiff states:

> I have reviewed your request form addressed to Warden Sapper, concerning you allegedly being threatened by gang members. I have spoken to SRG staff who indicates [sic] that they have addressed your concerns by meeting with you, but none of your allegations have been credible. I was also advised that the altercation between you and Offender Cox was possibly staged for both of you to get out of the pod. You should be meeting the facility PCC [sic] to discuss your request for protective housing. I suggest you provide detailed information to include names of SRG offenders that are threatening you in order for an appropriate investigation to be conducted. If further assistance is required, please advise.

Id. at 1.

The pre-typed Bertie C.I. form by which plaintiff requested protective housing on May 1, 2020, states he "feels that [his] life is in danger in the general population," and seeks placement "in Administrative Segregation for protective housing." See Defs.' App., [D.E. 97-5] at 25.

This form also has separate sections for plaintiff's request for removal from protective housing and declaration of non-protective needs, both signed on May 12, 2020. See id. (stating he requests "to be removed from protective custody and placed in the general population" "due to no longer having fear for [his] life or well being in the inmate's general population," and "relinquish[es] the State of North Carolina and the Department of Correction of any and all responsibility for [his] life or well being other than that of regular departmental policy"); id. (stating he neither needs nor requests protective custody, but "request[s] to be placed in the general population where [he] assume[s] all risks involved normally associated with routine assignment," that this is his decision, and that he "will not hold the Department of Correction responsible for any special protective needs other than those afforded to every inmate in the general population").

In response to the order observing that the odd pagination of the protective housing request form lent some credence to plaintiff's claim that documents were altered, see Order [D.E. 94] at

16

7–8, Locklear declares this pagination is used at Bertie C.I. and the exhibit produced is a scanned copy of the original, see Defs.' App., Ex. 3, Locklear Supplemental Decl. [D.E. 97-3] at ¶¶14–15; id., Ex. 8, [D.E. 97-8] at 1 (one-page Bertie C.I. form with three sections: request for protective housing; removal from protective housing; and inmate declaration of non-protective needs).

Succinctly stated, Sapper's referral of plaintiff's correspondence to Locklear for investigation was reasonable. See Farmer, 511 U.S. at 844 (finding an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted."). The record does not support an inference that Sapper knew of but disregarded a substantial risk of serious harm to plaintiff, id. at 837, recognized his "actions were insufficient to mitigate the risk of harm," Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation marks and citation omitted), or acted with a culpable state of mind, Strickler, 989 F.2d at 1379; see King, 76 F.4th at 269 ("At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." (citation omitted)). Sapper was, at most, negligent as to the risk to plaintiff, the danger of which he "should have perceived but did not." Farmer, 511 U.S. at 838; see Ford, 108 F.4th at 230 (affirming summary judgment for Warden who received a letter that an inmate feared for his safety and then referred the letter to an Associate Warden for investigation).

To the extent plaintiff instead seeks to hold Sapper liable for the actions of other officers on a supervisory liability theory, plaintiff fails to show that any subordinate's conduct was "pervasive," meaning "widespread, or at least has been used on several different occasions," or that Sapper was deliberately indifferent due to his "continued inaction in the face of documented widespread abuses." Cf. Shaw, 13 F.3d at 799.

17

Viewing the record evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of evidence to support plaintiff's failure-to-protect claims against Sapper, Celotex, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted); see Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)). Thus, Sapper is entitled to summary judgment. Anderson, 477 U.S. at 249.

Alternatively, as a government official, Sapper is entitled to qualified immunity from civil damages so long as his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Pearson v. Callahan, 555 U.S. 223, 236 (2009) (providing qualified immunity is available when 1) plaintiff has not demonstrated a violation of a constitutional right, or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, because there is no showing that Sapper's action – referring plaintiff's claims to Locklear for investigation – violated plaintiff's clearly established rights, Sapper also is entitled to qualified immunity. Id. at 743 ("When properly applied, [qualified immunity] protects 'all but

18

the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); Pearson,

555 U.S. at 236; see King, 76 F.4th at 266 n.7 (4th Cir. 2023) (noting, "even if the risk of inmate

violence was substantial and [defendant] knew that—[plaintiff] needs precedent establishing that

[defendant's] efforts to mitigate that . . . were constitutionally deficient." (citation omitted)).

    C. <u>Defendant Locklear</u>:

    Locklear declares, *inter alia*: Locklear was and is an Associate Warden at Bertie C.I.;

Locklear is responsible for daily operation of custody; Bertie C.I. has procedures for inmates

requesting PC, including submitting a written request through a standard form that explains why

the offender feels he requires PC; when a PC request is received, an officer is assigned to

investigate which "involves gathering statements from those named in the request"; the

information collected in the investigation then is submitted to the FCC "to determine if there is a

legitimate need or concern for the requesting offender's safety"; "If there is a legitimate need for

PC, the FCC will grant the requesting offender PC"; "To determine whether there is a legitimate

need for PC, the offender should provide as much information as they can to the FCC regarding

their safety concerns"; while the investigation is ongoing, the requesting offender is removed from

regular population and placed in RHAP; as an Associate Warden, Locklear did not interact with

offenders on a daily basis, did not regularly interact with plaintiff, and does not remember any

conversations he may have had with plaintiff; on May 3, 2020, plaintiff wrote Warden Sapper

about threats plaintiff had allegedly received from other Bertie C.I. offenders; Sapper forwarded

the information to Locklear for review and to decide on the appropriate action, and also informed

plaintiff of this referral; the only communication with plaintiff of which Locklear is aware is

Locklear's May 6, 2020, memo which told plaintiff Locklear "spoke with staff who indicated that

19

they had addressed Plaintiff's concerns and concluded that none of Plaintiff's allegations were credible," and reminded plaintiff about PC request procedures; although the memo also referenced a future meeting with the PCC, Locklear meant the FCC; "The terms PCC and FCC are used interchangeably in the regular course of prison operations, so PCC should be understood as a reference to the FCC in this context"; although it was not improper for plaintiff to write Locklear, Bertie C.I. "encourages offenders to use the procedures available to them to ensure that all requests are well documented and all necessary information is provided in the initial request"; this "is also why [Locklear] advised Plaintiff to provide detailed information in his request, like including the names of the offenders who had allegedly threatened plaintiff"; the investigation following plaintiff's May 1, 2020, PC request entailed plaintiff's move to RHAP on the same day, plaintiff's May 3, 2020, letter to Warden Sapper seeking to meet regarding his PC request, Sapper's May 5, 2020, response informing plaintiff that his letter had been forwarded to Locklear, Locklear's May 6, 2020, memo to plaintiff stating that Locklear reviewed the request form and spoke to SRG staff who "indicated they addressed Plaintiff's concerns by meeting with him, but none of the allegations have been credible," and plaintiff's May 12, 2020, meeting with the FCC "where he signed and submitted a Removal from Protective Housing form and an Inmate Declaration of Non-Protective Needs form"; Locklear "did not have any notable interactions with Plaintiff that would indicate to [Locklear] that he was at risk of harm"; "Page 25 of Exhibit 5 from Defendants' motion for summary judgment is the facilities Request for Protective Housing Form. The form is divided into two sections"; Page 25 of Exhibit 5 is not the combination of two documents but is a "scanned copy of the original form completed by Plaintiff"; and, although Bertie C.I. no longer has a blank version of the form from May 2020, Exhibit B attached shows the most recent restrictive housing

20

request form, which also is divided into two separate sections. See Defs.' App., Ex. 3, Locklear Supplemental Decl. [D.E. 97-3].

Locklear also declares: Locklear was never aware of who had been threatening plaintiff; plaintiff never provided the names of the offenders who allegedly had threatened him; following Locklear's "conversation with staff, Plaintiff's failure to provide any information on the alleged threats, and Plaintiff's failure to provide any names of specific offenders, there was no reason or evidence to suggest that Plaintiff needed PC"; Locklear has no other direct knowledge of the events alleged in the complaint; and, via an incident report, Locklear "can see that, on May 12, 2020, Plaintiff requested to return to general population housing and signed a statement stating that Plaintiff no longer needed PC." See Defs.' App., Ex. 3, Locklear Decl. [D.E. 74-3] at ¶¶11–13.

Here, the record also includes a partially redacted copy of Bertie C.I. Standard Operating Procedures for Protective Control. See id., [D.E. 97-6] at 2, 8–10 (providing, inter alia, that: once an offender requests protective control, "the offender will initially be assigned to a 72-hour control status pending further investigation" and "justification for this action will be documented"; "supervisory staff will begin a detailed investigation or assign the investigation to the appropriate person (assistant unit manager, or sergeant on the offenders housing unit)"; "initial information will be recorded on a witness statement form (DC-138B) from the reporting staff member and the offender" and "statements should include the offender's reason for requesting protective control, names and OPUS numbers of any other offenders involved, details of any claimed assaults on the offender in question, and any other pertinent information"; "if the investigation can be completed within the 72-hour timeframe, the investigation officer should place the details uncovered during the investigation in the (F13) comments with recommendation in regard to the offender's request

21

for protective control"; "at the conclusion of the investigation . . . the referral will be routed to the unit manager" to "review the case and place comments and recommendations in the (F14) comments"; "in cases where the investigation reveals the need for continued assignment to protective control or the investigation [is] inconclusive . . . the unit manager will notify the classification coordinator at least three (3) working days prior to the end of the approved 15-day control action" in order "to provide sufficient time to further investigate the case, be reviewed by the [FCC], with disposition by the final approving authority [sic]"; "the Classification Coordinator/designee will provide the offender advance notice of review by the [FCC] on form (DC-123) at least 48 hours before meeting the committee"; "Following review by the [FCC], the action will be routed to the Unit Manager" who "will review the case and compete the unit level review with comments and recommendations in the (F3) section. The unit manager will route the case to the Assistant Superintendent of Programs for disposition and completion of the facility level review with comments in the (F14) section"; "If an offender requests in writing to be removed from protective control, the Warden, or designee may review the request to determine that the life or personal safety issues are no longer implicated in the specific cases and remove the requesting offender from protective control, if appropriate. All such actions will be documented using the Control Action Screen (IS11) and forwarded to the Classification Servies Manager for administrative review with comment notation conforming the written request by the offender for removal from protective control and will be on file in the offender's unit file.").

Although the court directed defendants to provide full investigation records. see Order [D.E. 94] at 8, the record lacks the documentation mandated by Bertie C.I. Standard Operating Procedures for Protective Control – *i.e.*, staff comments and recommendations, DC-138B witness

22

forms, etc. Due to these absences in the record, the court infers either that the standard procedures were not followed or that no investigation into plaintiff's claims occurred. See Martin v. Weber, No. CV DLB-22-922, 2024 WL 1329295, at *9–10 (D. Md. Mar. 28, 2024) (noting the absence of investigation documents for an inmate's PC request claims suggests no investigation occurred).

Succinctly stated, there are genuine disputes of material fact as to whether plaintiff's May 1, 2020, PC request included a DC-138B witness form identifying the inmates threatening him, and whether Locklear investigated the claims in plaintiff's May 1, 2020, PC request and May 3, 2020, letter to Warden Sapper and, if so, what this investigation entailed. Compare Defs.' Stmt. Mat. Facts [D.E. 96] at ¶5 ("After Plaintiff submitted a request for PC . . . on May 1, 2020, Plaintiff was placed in RHAP while a Control Investigation was conducted," but his "request for PC did not specify the names of those who were allegedly threatening him or any substantive evidence of the allegations"), and Defs.' App., Ex. 3, Locklear Decl. [D.E. 74-3] at ¶¶11–13 (declaring, inter alia, that: Locklear was never aware of who had been threatening plaintiff; plaintiff never provided the names of the offenders who allegedly had threatened him; and, following Locklear's "conversation with staff, Plaintiff's failure to provide any information on the alleged threats, and Plaintiff's failure to provide any names of specific offenders, there was no reason or evidence to suggest that Plaintiff needed PC"), with Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶2–3, 5 (stating: although he submitted a PC request and a form "DC-138B statement," no Control Investigation occurred; had a Control Investigation been accomplished, "it would look like" a standard Control Investigation form; and, he "did submit a request for PC on the offender request form and in writing on a DC-138B witness statement form specify the names of those (SRG) Security Risk Group offenders that [were] threatening him"), and Pl.'s Aff. Stmt., [D.E. 100-3] at 3 (declaring, inter

23

*alia*, that no Control Investigation was done by Bertie C.I. staff either before or after his stabbing); and Pl.'s Aff. Stmt., [D.E. 84-4] at 11–13 (declaring, *inter alia*, that plaintiff "never spoke with SRG staff concerning any threat on [his] life" until the May 12, 2020, hearing); see also Pl.'s App., Ex. 16, [D.E. 101-5] at 87, ¶8 (Locklear's Nov. 8, 2023, responses to plaintiff's Requests for Admissions, admitting "that Plaintiff notified [Locklear] that his life was in danger by SRG members on other occasions besides May 1, 2020"); id. at 91, ¶1 (responding to plaintiff's Requests for Admissions query as to whether Locklear "received a letter from Plaintiff saying his life was in danger on or prior to May 1, 2020," "Denied, it was after May 1").

Viewing the record evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, a reasonable factfinder could find that Locklear disregarded an obvious, substantial risk of harm to plaintiff and recognized that his actions were inappropriate in light of that risk, Farmer, 511 U.S. at 837; Ford, 108 F.4th at 230; King, 76 F.4th at 269; see Raynor v. Pugh, 817 F.3d 123, 127–28 (4th Cir. 2016); Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015); Danser v. Stansberry, 772 F.3d 340, 347 (4th Cir. 2014). Thus, Locklear is neither entitled to summary judgment, Anderson, 477 U.S. at 247–48, nor to qualified immunity, see Tolan v. Cotton, 572 U.S. 650, 655–56 (2014).

    D. Defendant White:

White declares, *inter alia*, that: White was and is the Bertie C.I. Classification Coordinator and is "responsible for disciplinary, restrictive, modified, and control housing"; White conducts FCC meetings and is responsible for transfers; Bertie C.I. has PC request procedures; when an offender requests PC, he is placed in RHAP while an investigation into his claims is conducted; the investigatory process "became known as a Control Investigation in 2021"; "An Investigation

24

is carried out typically through the officers in the requesting offender's housing unit"; "The findings from an Investigation are submitted to the FCC to determine if there is a legitimate [ ] concern for the requesting offender's safety"; the FCC meets with offenders requesting PC and will grant legitimate PC requests; the PCC "meets with offenders who are already in PC and are requesting to say in PC"; "The FCC and the PCC perform the same function" and the terms "are used interchangeably during the regular course of prison operations"; "PCC should be understood as a reference to FCC since Plaintiff was requesting to go into PC"; "To request an Investigation and PC, an offender must make the request in writing using a protective housing request form, which requires the requesting offender to explain why he needs protective housing"; as White typically does not interact with general housing offenders on a daily basis, it would be uncommon for an offender to verbally inform White they are receiving threats or to verbally request PC from White; "If an offender were to verbally tell [White] of a threat in their housing unit, [White] would notify the offender's Unit Manager that the offender had safety concerns," and then "it would be the Unit Manager's responsibility to take proper actions to protect the requesting offender until an Investigation could be conducted into the requesting offender's allegations"; White recalls only one conversation with plaintiff which occurred at the May 12, 2020, FCC meeting discussing plaintiff's PC request with White and other FCC members, Captain Michael Deloatch and Sergeant Larry Coley; "At that time, the FCC had not received any information of an assault or a threat of an assault on Plaintiff"; "Plaintiff made the request for PC without any substantiating facts or evidence"; "Plaintiff refused to provide the name of the offenders who had allegedly threatened to harm him"; "During the FCC meeting, Plaintiff was informed that he could return to the general population or be placed in control housing until there was space available for Plaintiff to be moved

25

to a different correctional facility," Eastern C.I.; at that time, "the COVID-19 outbreak resulted in the [North Carolina Department of Adult Correction] NCDAC implementing additional restrictions regarding the movement of offenders between correctional facilities"; "The transfer of offenders between different correctional institutions had stalled with little to no transfers occurring during that time"; this also is why plaintiff could not be immediately transferred to a different correctional facility; "After the FCC informed Plaintiff of his options, Plaintiff became irate with the FCC"; "Plaintiff stated that he was assaulted and that he should not be punished by having to go to Control Housing"; White "again explained to Plaintiff that with the COVID-19 outbreak and the bare bones PC request" he provided, "his option for remaining safe would be to remain in Control Housing"; the FCC gave plaintiff the option of remaining in Control Housing or returning to general population; "Plaintiff had complete discretion and control in his decision"; "Plaintiff responded that he was freely choosing to return to general population housing" and signed 1) a statement that he was requesting "to be removed from protective housing and to be placed in the general population at Bertie [C.I.] due to no longer having fear for [his] life or well being in the inmate's general population," and he "relinquish[ed] the State of North Carolina and the Department of Correction of any and all responsibility for [his] life or well-being," and 2) a statement that he requested placement in the general population, "assume[d] all risks involved normally associated with routine assignment," that it was his "decision, and [he] will not hold the Department of Correction responsible for any special protective needs"; White is aware that plaintiff returned to general population housing on May 14, 2020, but has "no other personal knowledge of the incident alleged in Plaintiff's complaint" and "had no other communication with Plaintiff other than the conversation described above during Plaintiff's FCC hearing"; "At no time

26

did Plaintiff tell [White] who had allegedly threatened Plaintiff"; "Without the names of who was allegedly threatening Plaintiff, it would not be possible to keep Plaintiff separated from those individuals"; and plaintiff "adamantly and voluntarily chose to return to the general population." See id., Ex. 2, White Supplemental Decl. [D.E. 97-2].

Here, the parties' opposing statements and declarations raise issues of material fact as to whether plaintiff identified the inmates threatening him during the May 12, 2020, FCC hearing such that White knew of, but disregarded a substantial risk of serious harm to plaintiff, see Farmer, 511 U.S. at 837; compare Defs.' App., Ex. 2, White Supplemental Decl. [D.E. 97-2] at ¶¶12–13, 21 (declaring: "Plaintiff refused to provide the name of the offenders who had allegedly threatened to harm him"; and "At no time did Plaintiff tell [White] who had allegedly threatened" him), and Defs.' Stmt. Mat. Facts [D.E. 96] at ¶9 ("Plaintiff refused to provide the names of offenders who had allegedly threatened to harm him"), with Pl.'s Aff. Stmt., [D.E. 100-3] at 1 (declaring he followed Locklear's advice to "provide detailed information to include names of SRG offenders that are threatening" him at the FCC hearing), and Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶9 (stating he "informed the defendant . . . that he was being threatened by SRG level three Gang members and provided the committee with the names of the Gang members that [were] threatening him"), see also Pl.'s App., Ex. 16, [D.E. 101-5] at 92 (White's admission that "Plaintiff informed [White] in the Protective Custody Hearing on May 12, 2020, that his life was in danger.").

Although White seeks to rely upon plaintiff's signed request for removal from protective housing and a declaration of non-protective needs, see Defs.' App., [D.E. 97-5] at 25, the parties' opposing statements and declarations also present issues of material fact as to whether plaintiff volunteered or was "forced" to return to the general population. Compare Defs.' App., Ex. 2,

27

White Supplemental Decl. [D.E. 97-2] at ¶18 (declaring plaintiff "adamantly and voluntarily chose to return to the general population."), and Defs.' Stmt. Mat. Facts [D.E. 96] at ¶¶10–11 (stating, *inter alia*, that: "Plaintiff became irate with the FCC and stated that he would not stay in PC control housing"; "The FCC further explained to Plaintiff that they could only ensure his safety by keeping Plaintiff in PC control housing"; "However, Plaintiff had complete discretion and control to decide to return the general population housing"; "Plaintiff was adamant about returning to the general population and stated that he was 'going back to the yard'"; "Plaintiff chose to return to the general population housing even though he was informed by the FCC that they could not ensure his safety"), with Pl.'s Aff. Statement, [D.E. 100-3] at 1–2 (declaring, *inter alia*, that: White denied him PC which "forced" him to "return to Tan housing where [he] feared for [his] life"; White told him "that she did not give a fuck who [he] called to tell them her name was P. White [sic]"; and White "stated go back to Tan housing where [he had] requested PC or she would put [him] on I-CON"), and Pl.'s Stmt. Mat. Facts. [D.E. 100-2] at ¶¶9–16 (stating, *inter alia*, that: he "never became irate with the FCC"; he "could not have been adamant about going back to general population because [he] was given the directive to return to Tan Unit where he was housed before he requested protective custody or refuse and be placed on Restrictive Housing"; he "was under direct duress coercion or threat"; if he refused, he "would have been disobeying a direct order and would have been placed in Solitary Confinement," depriving him of various privileges; he "did not fully understand the collateral consequences of signing any alleged waiver of rights"; and he "made it clear to defendants at the hearing that he still feared for his life in the general population"); see also Pl.'s App., Ex. 16, [D.E. 101-5] at 92 (White's admission that "plaintiff was told he would be placed in I-CON if he did not return to Tan Unit on May 14, 2020").

28

Viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, because there are genuine issues of material fact whether White disregarded an obvious, substantial risk of harm to plaintiff and recognized her actions were inappropriate in light of that risk, a reasonable factfinder could find that White violated plaintiff's Eighth Amendment rights, Farmer, 511 U.S. at 837; Ford, 108 F.4th at 230; see Raynor, 817 F.3d at 127; Makdessi, 789 F.3d at 133; Danser, 772 F.3d at 347. Thus, defendant White also is neither entitled to summary judgment, Anderson, 477 U.S. at 247–48, nor to qualified immunity, see Tolan, 572 U.S. at 655–56.

Conclusion:

In sum, the court: GRANTS IN PART defendants' amended motion for summary judgment [D.E. 95] as to all defendants in their official capacities, and as to Sapper in his individual capacity, but DENIES the motion as to Locklear and White in their individual capacities; REFERS the case to Magistrate Judge Robert B. Jones, Jr. for a court-hosted settlement conference; APPOINTS North Carolina Prisoner Legal Services, Inc. ("NCPLS") for the limited purpose of assisting plaintiff in the settlement conference, see Standing Order 21-SO-11 at ¶7; and DIRECTS the clerk to send NCPLS a copy of this order as notification, and to ADMINISTRATIVELY CLOSE the case until the settlement conference concludes. Judge Jones will notify the parties how he wishes to proceed concerning the settlement conference, including the date on which it will be held.

SO ORDERED this 24th day of September, 2025.

RICHARD E. MYERS II
Chief United States District Judge